**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DIANE OTERO-BELL,

    Plaintiff,

v.                                                         No. 10-cv-623-RB-LFG

LOS ALAMOS NATIONAL
SECURITY, LLC,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on the Motion for Summary Judgment filed by Defendant Los Alamos National Security ("LANS") on February 9, 2011 (Doc. 44). Defendant moves for summary judgment on all counts of the complaint, contending that the undisputed facts do not show that Plaintiff experienced unlawful retaliation or discrimination in her employment with Defendant. Plaintiff Diane Otero-Bell opposes the motion. Having considered the submissions and arguments of counsel and the relevant law, and being otherwise fully advised, I find that the motion is well taken and shall be granted in full.

**I.    Background**

    **A.    Procedural History**

Plaintiff's complaint brings causes of action for retaliation, discrimination under the New Mexico Human Rights Act ("NMHRA") and Title VII of the Civil Rights Act of 1964 ("Title VII"), breach of contract, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, constructive discharge, and prima facie tort (Doc. 1-1). Defendant argues that Plaintiff voluntarily chose to step down from her part-time managerial

position instead of taking an offer of full-time employment, voluntarily took a leave of absence to pursue educational opportunities, and finally voluntarily resigned from LANS to change careers. Plaintiff argues that she, as a Hispanic female, was treated disparately in her conditions of employment as compared to similarly situated white males, and that there is enough evidence in the record to send the case to the jury on all claims.

**B.     Factual History**

For the purposes of this motion, the Court finds that the following facts, viewed in the light most favorable to the Plaintiff, are undisputed.[1] LANS operates Los Alamos National Laboratory ("LANL") pursuant to a contract with the National Nuclear Security Administration, a quasi-autonomous agency within the Department of Energy ("DOE") that manages and secures the nation's nuclear weapons. LANL uses nuclear materials on a daily basis, and has to account for these materials to the DOE. At LANL, the Materials Control and Accountability ("MC&A") Group oversees the nuclear materials accountability program.

Ms. Otero-Bell was employed with LANS as a Program Manager and/or Group Leader for the MC&A Group, known as "SAFE-4." She replaced Wayne Punjak, the previous Group Leader, who was removed for not performing his functions. Mr. Punjak was moved into another group and his salary was not reduced. Ms. Otero-Bell worked full-time between 2005 and 2007, and in 2008, she put in a request to return to part-time status for personal reasons. Her request was granted. At that time, Ms. Otero-Bell's annual salary was $154,799.99, which fell at the maximum end of the salary range for the position. She reported primarily to Paul Sowa, the

---

[1] The facts set forth in this section are not disputed unless noted, and are supported by the parties' exhibits. For ease of reading, references to supporting exhibits are omitted.

2

Associate Director for Security and Safeguards. Ms. Otero-Bell, however, grew dissatisfied with the way management treated her while she was leading this Group. Ms. Otero-Bell often requested additional resources, and she wanted to reorganize the group. Management denied these requests, for the most part. Ms. Otero-Bell did receive some support in her position – while she was the Group Leader, she hired three employees, received a transfer employee, and partly reorganized the group. During this time, Ms. Otero-Bell was still able to bring the Group from "failing" to "fully satisfactory."

The pivotal event giving rise to this lawsuit occurred in January of 2009. Ms. Otero-Bell reported to the DOE a potential Nuclear Material Inventory Difference. Serious consequences ensued from this report: production lines were closed, contract deadlines were not met, performance bonuses were at stake, and the lab was at risk of being shut down. The Division Director for the Safeguards Division, Joel Williams, sent DOE a request to downgrade the incident, but it was denied. An independent Defense Nuclear Security Special Review Team came to investigate LANS, and they issued a report that was highly critical of the MC&A program and the Group in charge of administering it – namely, SAFE-4. The report indicated that they had no confidence in the current leadership team, and found that Ms. Otero-Bell did not possess the technical skills or the professional skills to lead the Group. In particular, the Review Team criticized the fact that the Group Leader, Ms. Otero-Bell, was a part-time employee.

Security and Safeguards Associate Director Michael Lansing, who had replaced Mr. Sowa in February, recognized that LANS had a "full-time crisis." The MC&A program could no longer continue with a part-time Group Leader. However, Mr. Lansing's predecessor, Mr. Sowa, continued to express confidence that Ms. Otero-Bell could improve the program and address the

Review Team's recommendations. Relying on Mr. Sowa's opinion, Mr. Lansing offered Ms. Otero-Bell a full-time position as the Program Manager/Group Leader for SAFE-4 on February 12. Ms. Otero-Bell turned it down the next day.

Ms. Otero-Bell believed that Mr. Lansing's offer was not sincere. She felt abandoned by the management team due to their previous failure to address her MC&A concerns – the same concerns that were also highlighted by the Review Team. The same management remained in place after the Review Team's report, and Ms. Otero-Bell felt that she had been cast as a scapegoat by management for the deficiencies in the MC&A Group. Declining this offer, however, led to complications for Ms. Otero-Bell's career with LANS. The Associate Director, Mr. Lansing, began a search for a replacement who could head the Group full-time. Ms. Otero-Bell's supervisors and colleagues felt that she had walked away from her responsibility to lead the group, and she had lost credibility in their eyes and in the eyes of many members of the Review Team – who were also sponsors of the Group. Mr. Lansing determined that it was not in the best interests of the Group, the new Group Leader, or Ms. Otero-Bell for her to remain in the Group. In short, Ms. Otero-Bell was told there was no longer a place for her in MC&A, despite her seventeen years of experience in the field. An outside hire and the only applicant for the position, Randy Fraser, took over as MC&A Group Leader and was granted resources that Plaintiff had previously requested but not received.

As a result of these events, Ms. Otero-Bell grew even more profoundly dissatisfied with her treatment. She points out that although she was not allowed to stay in MC&A, other employees in the MC&A management chain remained in place. She was not included in discussions among LANS management after the Review Team's report was issued. Her April

mid-year performance evaluation was negative and inaccurate, although she was given the opportunity to submit comments on the evaluation.

In March, Ms. Otero-Bell was reassigned to a non-management position as an MC&A Specialist 4 and her salary was reduced to approximately $128,000 in accordance with LANS' policy that an individual's salary will be adjusted to reflect any new job duties. This salary fell at the maximum end of the salary range for the position. She received no warning about when the salary decrease would take effect. Ms. Otero-Bell was assigned to assist with the first phase of a project to upgrade the software for the computer nuclear material accounting system ("MASS Replacement Project"). Ms. Otero-Bell received excellent reviews and the project leader asked for her to be kept on the project, but Mr. Williams was concerned because the project was scheduled to end in summer 2009.[2] He told Ms. Otero-Bell to start looking for a regular, funded position.

Ultimately, Mr. Williams presented her with three possible employment opportunities outside the Group. Ms. Otero-Bell accepted a Security Specialist 4 position as a deployed security officer to the deputy director in Andrew Budka's group during the second week of June 2009. Mr. Budka believed that Ms. Otero-Bell would be a good fit for this position because of her experience at LANS and her "pleasant, commanding personality." Ms. Otero-Bell was excited about the new position, but once she started, she began to feel that the job description and the job as assigned were at odds. Security Specialist 4 was a challenging, high-level job at

---

[2] It is not clear whether Plaintiff disputes this fact. While she seems to believe that she should have been kept within the MC&A Group because the project still had funding, her brief fails to actually dispute this specific fact, *see* Doc. 49 at 9 (no response to UMF23), and the Court did not find evidence in the record to contradict Mr. Williams' testimony concerning the project's scheduled end date.

the same rate of pay as she had been receiving on the previous software project in MC&A. However, Ms. Otero-Bell soon developed grievances with her new position. Ms. Otero-Bell was not allowed to acquire data to begin developing recommendations for minimizing security incidents, or attend meetings with her immediate supervisor, Mick Irving. A percentage of Ms. Otero-Bell's time was devoted to distributing cell phone tags, checking graffiti, and searching through recycle bins for sensitive information. Ms. Otero-Bell's Human Reliability Program security designation was revoked, and her office was moved into a section of basement-level offices, with the understanding that her office would later be moved to a different building.

Ms. Otero-Bell soon spoke with Mr. Irving and Mr. Budka, telling them she had to leave LANS because her career was destroyed. Over time, Ms. Otero-Bell would have been eligible for a management position in the new group, but in July 2009 she requested a leave of absence without pay. In July 2010, Mr. Budka contacted Ms. Otero-Bell to see if she would be returning to the Laboratory. After consulting with her attorney, Ms. Otero-Bell indicated that she would not be returning to work at LANS.

Throughout this entire time, Ms. Otero-Bell applied for and made inquiries about other job openings in LANS and although she was qualified for these jobs, her applications were not successful. She now works as a math teacher and soccer coach in the Santa Fe Public Schools, making approximately $30,000 per year. In sum, Plaintiff contends that she was unable to adequately perform her various jobs because of LANS' treatment of her, and that similarly situated white males were not subjected to such treatment.

**II.     Legal Standard**

Summary judgment is only appropriate when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; it may not rest on mere allegations or denials in its own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). In order to avoid summary judgment, the nonmoving party must put forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor. *Id.* at 249. A mere scintilla of evidence in the nonmovant's favor is not sufficient. *Id.* at 252. Analysis of a summary judgment motion requires that the court consider all the evidence in the light most favorable to the nonmoving party. *Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

### III.    Discussion

#### A.    Retaliation

Plaintiff brings a claim for "retaliation" in the first count of her complaint. The complaint does not specify the cause of action under which the retaliation claim arises, but Defendant has briefed the tort of retaliatory discharge under state law, and Plaintiff's response cites law relevant to that state law tort.[3]

To establish the elements of the tort of retaliatory discharge, Plaintiff must present evidence showing that: 1) she was discharged because she performed an act that public policy

---

[3] Plaintiff in fact could not bring her claim for retaliation under a federal statute such as Title VII, which only protects "opposition to discrimination." *McDonald-Cuba v. Santa Fe Protective Servs., Inc.*, – F.3d –, 2011 WL 1746204, at *4-5 (10th Cir. 2011).

has authorized or encouraged, or that she refused to do something that public policy condemns; 2) the employer knew or suspected that her action involved a protected activity; 3) there was a causal connection between her protected actions and the employer's act of discharging her; and 4) she suffered damages thereby. *Weidler v. Big J Enters., Inc.*, 953 P.2d 1089, 1096-97 (N.M. Ct. App. 1997). Here, Defendant challenges the first and third elements of the tort: whether or not Plaintiff was "discharged" and whether there was a causal connection between the protected activity and the employer's actions.

The Court agrees with Defendant that there is no causal connection between any protected activities engaged in by Plaintiff and any adverse employment action she suffered. My. Lansing's offer of full-time employment as Group Leader of SAFE-4 entirely disproves the conjecture that LANS retaliated against her for making the security complaint to DOE. LANS correctly points out that the offer was made after LANS was fully aware of the complaint and the consequences that ensued from it. Plaintiff's contention that the offer was not "sincere" is conclusory and not supported by any other evidence in the record. Likewise, Plaintiff's arguments on behalf of Mr. Fraser and his alleged "summary removal" do not help here, for she lacks standing to assert claims on behalf of Mr. Fraser, and Mr. Fraser's removal is not relevant to her lawsuit. Because LANS offered her full-time employment in the Group she wished to work in, Plaintiff's contentions that her subsequent demotion and transfer fail to establish that LANS retaliated against her for making a security complaint. Essentially, Plaintiff asks this Court to hold that an employee may bring a complaint against an employer after engaging in protected activity, even if the employer rewards the employee with a job offer or promotion, simply by claiming that the offer is not "real," with nothing but conclusory assertions to support

such a claim.

Unquestionably, Plaintiff was not discharged from her employment with LANS. Plaintiff voluntarily turned down an offer of full-time employment in February 2009, voluntarily took a leave of absence from her next job in July 2009, and then voluntarily resigned her employment from LANS in July 2010. In response, Plaintiff argues that she was retaliated against based on the "adverse employment actions" taken by LANS in the course of her employment: giving her an insincere full-time job offer, removing her from the funded MASS Replacement Project, telling her no employment would be available for her in MC&A, and transferring her to the Security Specialist position where she performed menial tasks. Because Plaintiff was, in fact, not fired from her employment with LANS, the Court will grant Defendant summary judgment on Count I of the complaint.

Plaintiff did not specifically raise the argument that she experienced constructive retaliatory discharge. To the extent that Plaintiff's evidence may support a claim of retaliatory constructive discharge, the Court rejects it for the reasons explained below.

### B.     Constructive Discharge

Count VII asserts a claim for constructive discharge. Although not an independent cause of action, constructive discharge would satisfy the "discharge" element of retaliatory discharge. *Cf. Littell v. Allstate Ins. Co.*, 177 P.3d 1080, 1090 (N.M. Ct. App. 2007) (recognizing the tort of retaliatory constructive discharge). "[C]onstructive discharge is a doctrine that permits an employee to recast a resignation as a de facto firing, depending on the circumstances surrounding the employment relationship and the employee's departure." *Gormley v. Coca-Cola Enters.*, 109 P.3d 280, 282 (N.M. 2005). An employee is constructively discharged when "the

employer made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign." *Id.* at 283. The standard for constructive discharge is "quite high." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).

Examples of adverse employment actions that rise to the level of constructive discharge include: a humiliating demotion, extreme cut in pay, transfer to a position in which the employee would face unbearable working conditions; threats of being fired; overt pressure to resign and accept early retirement; retaliatory measures; reassignment to a job without a job title and description; and office relocation to a supply closet. *Gormley*, 109 P.3d at 283.

It is clear that Plaintiff was not constructively discharged from her employment. Her salary was lowered by 17% after she declined the full-time job offer. This is not an "extreme" cut in pay. Plaintiff was then transferred to a Security Specialist 4 position where she found that she was not "allowed" to attend meetings or acquire data, and was tasked with graffiti inspection and recycle bin-checking for a "few percent" of her time. However, these circumstances do not constitute "unbearable working conditions." Plaintiff was in this position for less than a month, and she knew she was tasked with performing "back-up" duties to Mr. Irving. Otero-Bell Dep. at 121:17-18. Logically, if Mr. Irving was available for a meeting, he would not have needed his back-up to attend the meeting. Plaintiff could not have reasonably foreseen that she would never be allowed to attend meetings in the future had she stayed in this job, or fulfill any of the other duties that she thought she should have been performing based on the job description. Plaintiff does not present any evidence disputing that, over time, she may have been eligible for management positions in that group. And lastly, the office in the basement did not make her working conditions intolerable – it was closer to the customer, meaning it was more convenient

for her and her employer, and many other people worked there. Otero-Bell Dep. at 163:25-164:12, 166:22-167:2. Plaintiff's generalized dissatisfaction does not convert LANS' actions into "egregious" actions. There is no support for Plaintiff's claim for constructive discharge.

### C. Discrimination

Plaintiff alleges in Counts II and III of her complaint that LANS discriminated against her on the basis of her gender and national origin, in violation of the NMHRA and Title VII. In the absence of direct evidence of retaliation, a plaintiff must rely on the three-part *McDonnell Douglas* framework to prevail under Title VII. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225-26 (10th Cir. 2008). Under this framework, a plaintiff must first establish a prima facie case of discrimination. If the plaintiff makes this showing, the defendant must proffer a legitimate, nondiscriminatory reason for the retaliatory actions. The plaintiff then has the burden of demonstrating that the defendant's asserted reasons for the actions are pretextual. *Fye*, 516 F.3d at 1227. New Mexico looks to federal law for guidance, *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 69 (N.M. 2004), and has adopted the same burden-shifting framework for NMHRA claims, *Sonntag v. Shaw*, 22 P.3d 1188, 1196-97 (N.M. 2001).

In order to establish a prima facie case of race or national origin discrimination, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d

1177, 1181 (10th Cir. 2002).[4] "[T]he third part of this test will be satisfied by proof that the employer treated similarly situated employees more favorably." *Id.* "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (internal quotations marks omitted).

Here, the parties disagree on whether the third element of this test is satisfied. Plaintiff claims that similarly situated white males have not been subjected to the same conditions of employment as Plaintiff. Plaintiff identifies two white males in particular who she believes demonstrate this disparate treatment: her predecessor, Mr. Punjak, and her successor, Mr. Fraser.[5]

Plaintiff claims that these employees were not subjected to the same ill treatment she received after she reported the Nuclear Material Inventory Difference. Plaintiff's argument is as follows:

> similarly situated white males voluntarily or involuntarily removed from their management positions, [sic] generally have not: lost their titles, been subject to reduced pay grade level, been removed from the management track, removed from well-funded meaningful work, transferred out of the group, transferred out of their main work subject area, received significant pay cuts, and been assigned

---

[4] Plaintiff recites a prima facie test wherein the third element consists of "disparate treatment among similarly-situated employees." Doc. 49 at 14. For the reasons explained in *Hysten*, 296 F.3d at 1181, this test "overstate[s] plaintiff's prima facie burden." This does not make a material difference in the analysis in this particular case, because Plaintiff's arguments relating to disparate treatment among similarly situated employees, if adopted by the Court, would satisfy the third part of the test outlined in *Hysten. Id.*

[5] To the extent Plaintiff implies that other white males experienced more favorable treatment, the Court cannot rule for her unless she specifically identifies the employees to which she is refering. Plaintiff bears the burden of identifying similarly situated employees and proving disparate treatment. *Hysten*, 296 F.3d at 1182.

to jobs significantly below their level of experience, education and skills.

Doc. 49 at 15 (emphasis removed). The problem with Plaintiff's argument is multilayered. She has not shown that either Mr. Punjak or Mr. Fraser are similarly situated to her, or that they received more favorable treatment than she did.

First, Mr. Punjak is not similarly situated to Plaintiff. His supervisor was Mr. Sowa, who was replaced by Mr. Lansing in February of 2009. Mr. Lansing is the relevant supervisor for this analysis, because the alleged adverse employment actions occurred after February of 2009. Therefore, Plaintiff and Mr. Punjak worked under different supervisors and are not similarly situated for the purposes of the discrimination analysis. Second, Plaintiff presented no evidence concerning Mr. Punjak's treatment before or after his removal as Group Leader. The burden is on the Plaintiff to prove disparate treatment, not on Defendant to disprove it.

As for Mr. Fraser, Plaintiff has again not shown that he is similarly situated to her or that he received more favorable treatment than she did. Plaintiff was a part-time Group Leader in 2009, and Mr. Fraser came on board as a full-time employee. Logically, since LANS determined that position needed a full-time employee, Mr. Fraser filled a different position than Plaintiff did, and is not similarly situated to her. *Cf. Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1115 (10th Cir. 2005) (male employee who replaced plaintiff was not similarly situated, because plaintiff had been working in an "hourly part-time position" and male employee started in a "full-time, regular position"), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Even if Mr. Fraser were similarly situated to Plaintiff, Plaintiff's contention that Mr. Fraser was treated more favorably than her fails when viewed in the light of the evidence in the

record. In all material respects, Mr. Fraser experienced the same treatment as Plaintiff. After the Los Alamos Site Office expressed concerns about Mr. Fraser's leadership, Mr. Lansing removed Mr. Fraser from the Group Leader position, and Mr. Fraser lost his job title, his management salary, and was transferred to a Security Specialist 4 position. Mr. Fraser ended up with exactly the same position and salary as Plaintiff held when she resigned her employment.

Plaintiff's only evidence of disparate treatment as between her and Mr. Fraser is that he received "resources" that she had been denied while she worked as Group Leader of SAFE-4. However, the perceived lack of management support did not affect Plaintiff's employment, for she continued as Group Leader until 2009, brought the Group from "failing" to "fully satisfactory," and the conditions of her employment were not changed until she declined the offer of full-time employment. Plaintiff's generalized complaint of lacking "resources" does not establish that Mr. Fraser was treated more favorably than Plaintiff.

In short, the evidence establishes that, far from discriminating against Plaintiff, LANS management actually wished her to continue in her position as Group Leader and continue improving the MC&A Group. However, LANS needed a full-time employee in that position, and Plaintiff has not disputed that the full-time job offer was made to her – the exact same job that Mr. Fraser was then offered. The evidence, therefore, establishes that Plaintiff and Mr. Fraser were treated alike in all material respects.

Even if this Court found that the perceived differential treatment as between Plaintiff and Mr. Fraser could give rise to an inference of discrimination, Plaintiff has failed to demonstrate that the employer's reasons behind Plaintiff's changed job status and lowered salary were

pretextual.[6] Pretext can be shown by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1198 (10th Cir. 2000) (internal quotation marks omitted).

The undisputed facts show that LANS needed a full-time Group Leader of SAFE-4, and when Plaintiff turned the full-time job down, she could no longer continue as a part-time Group Leader due to the deficiencies in the MC&A Group highlighted by the Review Team. Plaintiff's contention that Mr. Lansing's offer was not "sincere" does not establish pretext, because Plaintiff does not dispute LANS' need for a full-time Group Leader or even the fact that she was actually offered this position. Furthermore, the undisputed facts show that the MASS Replacement Project was to end in the summer of 2009, and Plaintiff would need a new job after this time. LANS, in fact, proposed several new opportunities for employment within the Laboratory. Although Plaintiff apparently wished to stay in the MC&A Group, that wish does not establish that LANS' reasons for offering her a different job are unworthy of credence. No reasonable juror could find that Plaintiff was told to find work outside of the MC&A Group because she was Hispanic or female.

D.      **Breach of Contract**

In Count IV her complaint, Plaintiff brings a claim for breach of contract. The complaint bases this cause of action on "LANS and DOE personnel policies, procedures, and regulations,

---

[6] In fact, Plaintiff has come very close to waiving this argument by including no analysis of pretext in her response brief. Doc. 49 at 17.

and LANS course of conduct regarding the same." Compl. ¶ 57 (Doc. 1-1 at 13). Defendant construes this as raising a claim for breach of an implied contract, and Plaintiff does not object to this characterization. Whether an implied contract or agreement exists depends on "all the surrounding circumstances, including the parties' words and actions," the way the parties dealt with each other, and any writings, handbooks or procedures used by the employer. *See* UJI 13-2302 NMRA (pattern jury instruction); *Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 783 (N.M. 1993).

Plaintiff does not explain which policies give rise to the implied contract or elaborate upon the content which supposedly creates this implied contract. The Court cannot perform this task for her. However, even if an implied contract exists between Plaintiff and LANS, Plaintiff's cause of action cannot be supported because Plaintiff bases the breach on the conduct underlying her other causes of action in this lawsuit which the Court has rejected already, namely discrimination and retaliation. *See* Doc. 49 at 18. Therefore, summary judgment will be granted on this count for the reasons explained above.

### E. Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count V of her complaint, Plaintiffs brings claims for breach of the implied covenant of good faith and fair dealing. Specifically, Plaintiff argues that she "has adduced facts sufficient to allow a jury to reasonably conclude that the adverse employment action shown and discussed above constitutes breaches of LANS [sic] duties towards her regarding discrimination retaliation and fair treatment/performance evaluations [sic]." Doc. 49 at 18.

Under New Mexico law, a duty of good faith and fair dealing exists in every contract. *See Jaynes v. Strong-Thorne Mortuary, Inc*., 954 P.2d 45, 50 (N.M. 1997). A breach of the covenant

of good faith and fair dealing requires a showing that the breaching party intentionally or in bad faith used the contract to injure the other party; negligent conduct is insufficient. *Id.* "Courts have defined 'bad faith' as conduct by the employer extraneous to the employment contract aimed at frustrating the employee's enjoyment of contractual rights, [and] have equated 'bad faith' with fraud, deceit, or misrepresentation . . . ." *Melnick v. State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1109 (N.M. 1988) (internal citations omitted). New Mexico courts have declined to recognize a cause of action in an at-will contract for breach of an implied covenant of good faith and fair dealing. *Callahan v. N.M. Fed'n of Teachers*, 131 P.3d 51, 58 (N.M. 2006). Neither party has addressed whether Plaintiff's employment is at will.

Nonetheless, Plaintiff's claim fails even if her employment is not at will. As explained above, the Court has found neither retaliatory discharge nor discriminatory motives to be present in any adverse employment action Plaintiff has suffered. As for the performance evaluation, Plaintiff does not explain why it constitutes evidence of either breach of implied contract or breach of the covenant of good faith and fair dealing. *See* Doc. 49 at 18-19. In any case, New Mexico has indicated that a negative performance evaluation cannot give rise to an action for breach of implied contract or a breach of the covenant of good faith and fair dealing, unless the evaluation formed the basis for an adverse employment action such as a termination or suspension. *See Henning v. Rounds*, 171 P.3d 317, 322-23 (N.M. Ct. App. 2007) (performance evaluation could not support cause of action where plaintiff was not thereby denied benefits under her employment contract). Plaintiff has produced no evidence that the performance evaluation impacted her employment with LANS.

Lastly, there is no evidence in the record that LANS "intended" to harm Plaintiff.

Plaintiff testified that she believes that LANS' employees "knew" that their actions were detrimental to her and her career, "[a]s evidenced by where [she] began and where [she] ended." Otero-Bell Dep. at 215:11-15.[7] "Intent" is a higher standard than "knowledge," and even if Plaintiff had evidence to back up this conclusory assertion, mere knowledge cannot support a finding of intent.

### F. Intentional Infliction of Emotional Distress

Count VI of the complaint states a cause of action for intentional infliction of emotional distress. The standard for recovery on an intentional infliction of emotional distress claim is very high. It requires the distress be "severe" and stem from "extreme and outrageous conduct." *Silverman v. Progressive Broad., Inc.*, 964 P.2d 61, 70 (N.M. 1998). "Severe" emotional distress is distress that "a reasonable person, normally constituted, would be unable to cope adequately with." *Folz v. State*, 797 P.2d 246, 254 (N.M. 1990). Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 41 P.3d 333, 342 (N.M. 2001).

Plaintiff fails to meet either element of this test. Loss of employment does not cause distress that a reasonable person would be unable to cope with. "Being fired is a common occurrence that rarely rises to the level of being 'beyond all possible bounds of decency' and 'utterly intolerable in a civilized community.'" *Trujillo*, 41 P.3d at 343. In this case, Plaintiff was

---

[7] As Defendant points out in the reply brief, Plaintiff attempts to dispute this fact (which was itself taken directly from her own testimony) by "offer[ing] a series of confusing allegations that do not pertain to her testimony on the subject in question." Doc. 54 at 6. The Court agrees, and will treat this fact as undisputed.

not even fired – she voluntarily resigned her employment. Furthermore, LANS' conduct was not "extreme" or "outrageous." Undoubtedly, LANS did not treat Plaintiff as well as she wished, and she experienced mental distress resulting from her situation. However, distress from loss of employment is not enough. "The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Id.* (internal quotation marks and citations omitted). There is no evidence in the record that could support this claim.

### G. Prima Facie Tort

Count VIII asserts a claim for prima facie tort. The elements of a prima facie tort are: (1) an intentional, lawful act by defendant; (2) an intent to injure the plaintiff; (3) injury to the plaintiff; and (4) the absence of justification or insufficient justification for the defendant's acts. *Schmitz v. Smentowski*, 785 P.2d 726, 734 (1990). Defendant moves for summary judgment on this count because prima facie tort cannot be used to evade the requirements of other causes of action. *Id.* at 738. Plaintiff, in response, does not explain the evidence that supports each element of this cause of action, or which specific conduct on the part of Defendant she is challenging, but merely asserts that this claim should be allowed to go to the jury. Plaintiff has failed to allege that Defendant has done anything unlawful other than discrimination or retaliation. When a plaintiff makes allegations of discrimination, summary judgment on the prima facie tort claim is appropriate. *Silverman v. Progressive Broad., Inc.*, 964 P.2d 61, 71 (N.M. 1998). Therefore, Plaintiff's allegations do not support a cause of action for prima facie tort.

### H. Punitive Damages

Lastly, Defendant moves for summary judgment on Plaintiff's request for punitive damages. Defendant asserts that there is no evidence from which to infer that its actions were

19

malicious, willful, reckless, wanton, fraudulent, or in bad faith. The Court need not reach this argument, because punitive damages do not constitute a stand-alone cause of action. The Court is granting summary judgment on the balance of the complaint, so the punitive damages claim must be dismissed.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 44) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's complaint is dismissed with prejudice, thus disposing of this case on its merits and in its entirety.

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**